Argued and submitted October 5, 1983, affirmed January 24, 1984

## STATE OF OREGON,
*Respondent on Review and*
*Petitioner on Review,*

*v.*

## CRAIG STEVEN POTTLE,
*Petitioner on Review and*
*Respondent on Review.*

(TC 20-567B, CA A22439, SC 29615, 29616)

677 P2d 1

Stephen J. Williams, Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner/respondent on review, Pottle. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Stephen F. Peifer, Deputy Attorney General, Salem, argued the cause and filed the brief for respondent/petitioner on review, State of Oregon. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

CAMPBELL, J.

Roberts, J., concurred and filed an opinion.

Peterson, C. J., dissented and filed an opinion.

Jones, J., dissented and filed an opinion in which Carson, J., joins.

## CAMPBELL, J.

This case involves the legality of a wiretap. The trial court found the wiretap order to be sufficient on its face, held that defendant Pottle lacked "standing" to object to the lack of minimization in the conduct of the wiretap, and denied his motion to suppress the wiretap and the derivative evidence. The Court of Appeals reversed, found that Pottle had "standing," suppressed the evidence and remanded for a new trial. 62 Or App 545, 662 P2d 351 (1983). We allowed review, restricting our review to the admissibility of the wiretap evidence.[1] We affirm the Court of Appeals.

Christopher Tucker was found dead in his apartment in the early morning of December 14, 1980. Because his death appeared to be a homicide, the police began an immediate investigation. Within a few days, they gathered information that led them to believe that Tucker's widow, Mindi Tucker, and a friend of hers, defendant Craig Pottle, planned and executed Christopher Tucker's death so they could share in the proceeds of his life insurance policy.

Mindi Tucker had separated from her husband a short time before his death, moving into a girlfriend's apartment. The police obtained an ex parte order authorizing and approving the interception of certain wire communications involving this friend's telephone on December 17, 1980. They later obtained two extensions for this same wiretap. None of the people involved in this order, including the district attorney and the police officers, had ever attempted a wiretap before. Although the purpose of the wiretap was to obtain information about the murder of Christopher Tucker from the conversations of Mindi Tucker and Craig Pottle, every conversation was intercepted and recorded in its entirety, regardless of the parties involved or the subject matter of the conversation. The police intercepted a total of 958 telephone calls. Of this total, 15 calls were conversations between

---

[1] We limited our review of the issues raised by the parties to the legality of the telephone interceptions. We put the word "standing" in quotation marks because it is the wrong word. A defendant always has standing to object to evidence to be used against him at his trial. The issue is not whether he has "standing" but whether the statute contemplates suppression of all unlawfully intercepted evidence or only if its interception was unlawful as to him.

defendant and Mindi Tucker and another six were defendant's unsuccessful attempts to reach Mindi Tucker.

The police ended the wiretap on January 16, 1981, following the arrest of Mindi Tucker and Craig Pottle for the murder of Christopher Tucker.

At a pretrial omnibus hearing, the court granted Mindi Tucker's motion to suppress all evidence from the wiretap, as well as all derivative evidence, finding that the police failed to minimize, that is, limit their interceptions to those conversations pertinent to the investigation.[2]

At the hearing on Pottle's motion to suppress the same evidence, the omnibus hearing on Tucker's motions was incorporated in its entirety. Pottle argued both to the trial court and the Court of Appeals that this wiretap evidence should be suppressed on several different grounds, including lack of probable cause to issue the order, facial invalidity of the order, lack of minimization in the conduct of the wiretap, (although he concedes his conversations could have been seized with a proper minimization order properly executed) and failure to seal the records promptly. The trial court denied his motion to suppress, and the jury found Pottle guilty of murder. The Court of Appeals reversed the trial court, finding that Pottle has "standing" to object to the lack of minimization in the conduct of the wiretap, and this lack of minimization required suppression of the wiretap evidence. We agree the evidence must be suppressed, but on different grounds.

The order authorizing the wiretap reads as follows:

"IN THE CIRCUIT COURT OF THE STATE OF OREGON
"FOR THE COUNTY OF WASHINGTON

"In the Matter of Interception ) Ex-parte Order Authorizing
of Certain Communications    ) and Approving the Interception
                             ) of Certain Wire Communications
                             )
                             )

"This matter came before the Court on the application under oath of Ray Robinett, the duly elected District Attorney of Washington County, Oregon, for an Order authorizing and approving the

---

[2] The state appealed this ruling, which was affirmed by the Court of Appeals. *State v. Tucker,* 62 Or App 512, 662 P2d 345 (1983). We denied the state's petition for review.

interception of telephonic communications of Mindi Tucker with Craig Pottle. The sworn application was supported by affidavits.

"That this Court FINDS from the application and supporting affidavits and statements that:

"1. There is probable cause for belief that Mindi Tucker committed, aided and abetted the commission or conspired to commit the murder of Christopher Tucker on December 15, 1980;

"2. That there is probable cause for belief that communications between Mindi Tucker and Craig Pottle concerning the murder of Christopher Tucker will be obtained through an interception of telephonic communications of Mindi Tucker;

"3. That normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried;

"4. There is probable cause to believe that the telephone of [Mindi Tucker's roommate] is one commonly used by Mindi Tucker.

"Therefore, it is ORDERED that:

"1. The interception of telephonic communications of Mindi Tucker are approved and authorized by this order;

"2. That the telephonic instrument, [location and name of Mindi Tucker's roommate] is the description and location of the facility from which the wire communication is to be intercepted pursuant to this order;

"3. That the communications to be intercepted are limited to telephone communications of Mindi Tucker which are made or received on the above described telephone which pertain to the murder of Christopher Tucker and the intended distribution of $75,000.00 insurance proceeds she expects to collect;

"4. That this interception order shall be carried out by the Washington County Sheriff's Office; the person authorizing the application is Lt. John Vallery of the Washington County Sheriff's Office;

"5. This order will remain in effect for a period of 15 days from the date hereof and will not automatically terminate when the above described communications are received; it will terminate automatically upon the expiration of the above period unless extended pursuant to ORS 133.724 (5) and applicable provisions of said statute;

"6. * * * * *

"7. The application, this order, all supporting documents and testimony in connection herewith shall remain confidential in the custody of the court and these matters shall not be released or information concerning them in any manner disclosed except upon written Order of this Court and as required under ORS 135.805 to 135.873; no person having custody of any records maintained under this Order pursuant to ORS 133.721 to 133.739 shall disclose or release any materials or information contained therein except under written Order of the Court as required under ORS 135.805 to 135.873.

"Dated this 17 day of December, 1980.

/s/ Donald C. Ashmanskas
Circuit Court Judge"[3]

The statute setting out requirements for a wiretap order is ORS 133.724(3)-(6):

"(3) Upon examination of such application and evidence [as described in ORS 133.724(1)] the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire or oral communications within the state if the judge determines on the basis of the facts submitted by the applicant that:

"(a) There is probable cause for belief that an individual is committing, has committed or is about to commit a particular crime described in paragraph (c) of subsection (1) of this section;

---

[3] This order initially included another paragraph, which the judge deleted:

"That periodic reports to the judge showing what progress has been made toward the achievement of the authorized objective and the need for continued interception _____ required at _____ intervals." We note that judicial supervision of a wiretap is made permissible by the statute, and thus the judge was within the law in deleting this provision, even though it is a recommended safeguard.

"(b)   There is probable cause for belief that particular communications concerning that crime will be obtained through such interception;

"(c)   Normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or are likely to be too dangerous; and

"(d)   There is probable cause for belief that the facilities from which, or the place where, the wire or oral communications to be intercepted are being used, or are about to be used, in connection with the commission of that crime are leased to, listed in the name of, or commonly used by the individual suspected.

"(4)   Each order authorizing or approving the interception of any wire or oral communication shall specify:

"(a)   The identity of the person, if known, whose communications are to be intercepted;

"(b)   The nature and location of the communications facilities as to which, or the place where, authority to intercept is granted;

"(c)   A particular description of the type of communication sought to be intercepted, and a statement of the particular crime to which it relates;

"(d)   The identity of the agency authorized to intercept the communications and of the person authorizing the application;

"(e)   The period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained; and

"(f)   The name of the applicant, date of issuance, and the signature and title of the issuing judge.

"(5)   No order entered pursuant to this section shall authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of authorization, nor in any event longer than 30 days. Extensions of any order may be granted, but only when application for any extension is made in accordance with paragraph (k) of subsection (1) of this section and the court makes the findings required by subsection (3) of this section. The period of extension shall be no longer than the authorizing judge deems necessary to achieve the purpose for which it is granted and in no event for longer than 30 days.

Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception, and must terminate upon attainment of the authorized objective, or in any event in 30 days.

"(6) Whenever an order authorizing interception is entered pursuant to this section, the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the judge may require."

ORS 133.735 provides for the suppression of intercepted communications:

"(1) Any aggrieved person in any trial, hearing or proceeding in or before any court, department, officer, agency, regulatory body or other authority of the state, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted under ORS 133.724, or evidence derived therefrom, on the grounds that:

"(a) The communication was unlawfully intercepted;

"(b) The order of authorization or approval under which it was intercepted is insufficient on its face; or

"(c) The interception was not made in conformity with the order of authorization or approval.

"(2) Such motion shall be made before the trial, hearing or proceeding unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion. If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall be treated as having been unlawfully obtained. The judge, upon the filing of such motion by the aggrieved person, may in the judge's discretion make available to the aggrieved person or the person's counsel for inspection such portions of the intercepted communications or evidence derived therefrom as the judge determines to be in the interests of justice."

"Aggrieved person" is defined by ORS 133.721(1):

"(1) 'Aggrieved person' means a person who was a party to any wire or oral communication intercepted under ORS 133.724 or a person against whom the interception was directed."

Immediate sealing of the recordings is required under ORS 133.729:

"* * * Immediately upon the expiration of the period of the order issued under ORS 133.724, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under the direction of the judge. * * *."

Defendant claims that the evidence from this wiretap must be suppressed pursuant to ORS 133.735 because: (1) the Oregon wiretap statute is unconstitutional or preempted by federal statutes; (2) the application failed to establish probable cause; (3) the wiretap order was defective in that it failed to include the minimization, termination and immediate execution provisions expressly required by ORS 133.724(5), and failed to specify defendant as a person whose communications are to be intercepted as required by ORS 133.724(4)(a); (4) the circuit court correctly held that the police failed to minimize the interception of nonpertinent calls, and the circuit court should therefore have suppressed all telephone calls; and (5) the tapes were not sealed immediately upon expiration of the order.

This is the first time this court has considered the interpretation of our wiretap statutes, which were amended in 1979. The state argues that because these statutes were adopted to bring Oregon's wiretap provisions in line with the federal standards in Title III of the 1968 Omnibus Crime Control Act, 18 USC §§ 2510-2520, this court should follow federal caselaw in the interpretation of these statutes. It also suggests that because other states have adopted provisions patterned on Title III, the decisions of these state courts should also be considered.

The state argues that all state and federal courts that have considered the question have upheld statutes similar to ours against per se attacks of unconstitutionality. It asserts that defendant fails to present a cogent argument on preemption and that it would be impossible to do so.

The state argues that the probable cause standard for the interception orders is the same as that required for warrants, and that under Oregon law the affidavits in the present case reach this level.

The state concedes that language calling for "execution as soon as possible" was omitted from the order, but contends that there was a termination clause in paragraph 5 of the order and argues that the order contains what "amounts to a minimization clause" in paragraph 3, both quoted above. The state argues that federal caselaw does not require talismanic words, and federal courts generally refuse to declare such an order invalid. The states also argues that ORS 133.724(4)(a) does not require the order to name Pottle, that the interception and recording of all calls was essentially in compliance with the minimization requirement, and that even if it was not, defendant lacks "standing" to challenge any alleged failure to minimize any intercepted calls other than those to which he was a party.[4]

In response to the charge that the tapes should be suppressed because they were not promptly sealed as required by ORS 133.729, the state contends that under either of the two general approaches adopted by the federal courts to this problem, the defendant cannot prevail. He failed to show prejudice resulting from the lack of immediacy in the sealing of the tapes, and the government proved an "adequate and reasonable explanation" for the delay, including measures that were employed to prevent tampering.

■    We need not resolve most of the arguments outlined above, because we hold that under our statutes the order is fatally defective, and the resulting evidence from the wiretap, as well as all derivative evidence, must be suppressed.

---

[4] In the present case defendant concedes that all conversations that he participated in could have been intercepted if there had been a proper order, but he argues that he is an "aggrieved party" under ORS 133.735(1) for purposes of challenging the lack of minimization of the conversations of other people. The state argues that he only has "standing" to challenge the state's failure to minimize conversations to which he was a party and cannot rely on the invasion of the rights of other people. Federal caselaw generally supports the state's position. *United States v. Ramsey,* 503 F2d 524, 532 (7th Cir 1974), *cert den,* 420 US 932 (1975), *United States v. Poeta,* 455 F2d 117 (2nd Cir), *cert den,* 406 US 948 (1972). One federal court reached the opposite conclusion. It held on a motion to suppress that a person in defendant's position could challenge the lack of minimization of the wiretap based on the interception of conversations in which he did not participate. *United States v. Scott,* 504 F2d 194 (DC Cir 1974). Following defendants' convictions, the United States Supreme Court also considered their case, but found it unnecessary to decide this question and declined to address it. *Scott v. United States,* 436 US 128, 135, n 10, 98 S Ct 1717, 56 LEd2d 168 (1978).

We examine first the order itself.

"The order serves the same function as a conventional search warrant by indicating judicial authority for the search, acting as the formal record of judicial action, establishing the limits of the search, instructing the officers on the scope of their authority and discretion, and providing the basis for determining the legality of the execution of the search." J. Carr, The Law of Electronic Surveillance, §4.07, 194-95.

ORS 133.724(5) clearly and unequivocally states:

"Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception, and must terminate upon attainment of the authorized objective, or in any event in 30 days."

The state concedes that there was no mention in the order that the interception be executed as soon as practicable.

It argues that "minimization" is found in the provision of the order which authorizes interceptions only of conversations to which Mindi Tucker is a party and the subject of which is either the murder of her husband or the insurance proceeds. This is not sufficient for a minimization provision, because it does not address the minimization of the interception of all other conversations. The application must provide probable cause for the order to issue. There was no probable cause even alleged to support the interception of any conversation other than those in which Mindi Tucker or defendant were parties.

There is no clause informing officers that they must conduct the interception "in such a way as to minimize the interception of communications not otherwise subject to interception." ORS 133.724(5). Minimization, like the above statutory restrictions on wiretaps, embodies the constitutional prohibition against general searches; all are intended to avoid seizure of conversations which have no relationship to the crimes being investigated or the purpose for which electronic surveillance has been authorized. These provisions serve the same purposes as the particularity requirement of a conventional search. "[T]he constitutional principle that all invasions of privacy must be limited in scope to the minimal

intrusion necessary to fulfill their purpose is related to minimization, with particular reference to the problems of duration and termination." (Footnote omitted.) J. Carr at §507, 257.

The state also argues that the order has a termination provision, because paragraph 5 of the order states that the order will terminate at the end of the applicable period. However, the statute requires that an order have a provision that the interception of the communications end when the objective of the wiretap is achieved. The order in this case does not have such a provision.

The statute requires the order to state that it "must terminate upon attainment of the authorized objective, or in any event in 30 days." This obviously requires that the authorized objective be carefully identified in the order so as to define the point when it has been attained and the authority ends. The first sentence of ORS 133.724(5) leaves no doubt that that interception is unauthorized and hence illegal when it exceeds the period necessary to fulfill the objective for which it was authorized or 30 days. "Continuous searches, like those which are either unspecific in their objective or look for items not authorized in a warrant, are aspects of the basic problem of general searches." Carr §5.07(1) at 257-58.

Both a termination directive and a duration directive are necessary to limit surveillance to the shortest period required to obtain the authorized conversations. This order contained a duration directive of 15 days; however, there was no statement to the officials conducting the wiretap that should they gain the objective authorized in the order in some lesser period the interception must cease. The order in the present case even states a contrary directive. Paragraph five of the order states that the order "will not automatically terminate when the above communications are received." Because the district attorney did not set out a precise objective in the application, we must assume that it was to gather enough evidence to convict Mindi Tucker and Craig Pottle of murder. This is supported by the testimony from the district attorney. If on the first day an officer heard and recorded an exact and full description of the crime and confessions of each of the parties, under this order he would believe he should continue listening and recording until the end of the 15 days. Whether

he would do this in order to gain superfluous evidence or out of sheer curiosity makes no difference, the continuation of any wiretap beyond the achievement of its objective is illegal, and under the Oregon statute the order must so state.

Defendant also contends that it was error for the order to fail to name him as a person whose communications were to be intercepted. *United States v. Kahn*, 415 US 143, 94 S Ct 977, 39 LEd2d 225 (1974), holds that the government is required to identify an individual in the application when it has probable cause to believe that the individual is engaged in the criminal activity under investigation and the individual's conversations will be intercepted over the target telephone. In *United States v. Donovan*, 429 US 413, 97 S Ct 658, 50 LEd2d 652 (1977), the Court reaffirmed this holding and made it clear that in some circumstances applications should name more than one person even though the federal statute also uses the word "person" rather than "persons."

In the present case the application named the defendant. The question presented is whether the order also needed to name him. We see no reason to distinguish between ORS 133.724(1)(g) which requires an application to include "the identity of the person, if known, suspected of committing the crime and whose wire and oral communications are to be intercepted," and ORS 133.724(4)(a) which requires that every order authorizing a wiretap specify "the identity of the person, if known, whose communications are to be intercepted." It was error to fail to name defendant as a person whose communications were to be intercepted. The District Attorney's request was for an order "authorizing and approving the interception of telephonic communications of Mindi Tucker and Craig Pottle." Pottle was the focus of this investigation in the same way that Tucker was. He was known to the police at the time they sought the order and they intended that his conversations would be taped. He should have been identified in the order as a person "whose communications are to be intercepted." ORS 133.724(4)(a).

The district attorney's testimony is clear that the two focal suspects at the time he made the original application were Mindi Tucker and Craig Pottle, and he felt that there was probable cause to believe they were both involved in the conspiracy to kill Chris Tucker. Even if the distict attorney

had not testified that he had probable cause regarding Pottle's involvement at the time of the initial application, he heard at least ten conversations between the two people before he applied for the first extension on December 31. In several of these conversations, Pottle mentioned the insurance money which he clearly expected to share. From this further evidence, Pottle surely should have been named in the first extension order.

The testimony was uncontroverted that the decision to arrest Pottle and Tucker was made by the afternoon of January 16, and yet in the application for the second extension, on January 15, Pottle was still not named as a target.

The requirement that known targets be identified in the order is not one of mere form. Naming the person whose conversations will be "seized" in the constitutional sense fulfills the particularity requirement of the constitutional guarantees against warrantless searches and seizures. In the conventional search the "place to be searched" must be described with particularity. In a wiretap the persons whose conversations are sought must be revealed. Both serve the purpose of confining the scope of the search and seizure to that evidence for which the police have already demonstrated probable cause and the need for the interception order.

We are aware that the majority of federal cases have approved what amounts to a substantial compliance standard for the statutory requirements. We consider this inadequate. Because of the inherent dangers of abuse in the wiretap process, we hold that Oregon courts must require strict compliance with all statutory requirements leading to the issuance of a wiretap order. The act of intercepting a communication is both a search and a seizure. *Katz v. United States,* 389 US 347, 353, 88 S Ct 507, 19 LEd2d 576 (1967). In the present instance, we are dealing with a search and seizure process that is inherently more intrusive than the traditional search and seizure. This statutory scheme shows two concerns: the authorization of a powerful tool to be used in criminal investigations and the protection of individual privacy. Our court system must carry out the legislature's concern for privacy as much as the aim of law enforcement.

Any police officer may apply for a search warrant, and any judge may sign such a warrant. ORS 133.545. We find

it significant that the Oregon wiretap statute requires that a district attorney make the application for any wiretap order and allows only a circuit court judge to issue such an order. ORS 133.724(1). The legislature has guaranteed that people trained in the law will be involved in the application procedure. We believe that it is not too "picky" to expect a person holding the office of district attorney to read the entire statute governing the contents of the application and order, and follow it.

Before a warrant will issue for an ordinary search and seizure, the person or thing to be seized must be described with particularity. In the wiretap situation a conversation, or the thing to be seized, does not exist at the time of the application for the order and will not exist until the time of the seizure. This makes it difficult to describe to the officers who are conducting the wiretap what it is that they may seize, and yet there must be a description that acts as a limitation. The order is the document that allows the police to invade the privacy of all people who use the telephone wire during the authorized period of interception, and limits that invasion. Our statutes are precise about what must be in this document to allow the use of a wiretap. A wiretap order cannot be in the nature of a general warrant and withstand a challenge. A wiretap order may not allow carte blanche surveillance, any more than a search warrant may allow a general search.

An ordinary search is a one time invasion of privacy, limited in duration and generally conducted with the knowledge of the suspect. A wiretap is a continuing surreptitious intrusion. In the present case, the wiretap lasted almost a month and intercepted 958 calls in which 79 different people participated. The police seized every conversation made on this telephone, taping them all as well as listening to them, even though most of the conversations dealt with matters in no way related to any crime.

By its very nature, wiretapping involves a broad invasion of privacy. Agents will always seize some non-pertinent conversations because of the difficulty in determining whether a conversation is pertinent and the concern that a conversation between named suspects might begin in an innocent manner and later become incriminating. But here the executing agents were left free to seize at will every

communication that came over the wire; indeed, they were directed to do so by the district attorney.

The physicial characteristics of the thing to be seized limit the ordinary search somewhat. An officer directed to look for a rifle could not look in a hat box or a cigarette package. This limitation in the scope is not as obvious in a wiretap; the minimization requirement assumes an enhanced importance as a result.

In an ordinary search, when an officer seizes the person or thing named in the warrant, the authority of the warrant ends and the search must end. This must also be true in the wiretap situation. The statute requires that when the objective of the wiretap is obtained, the wiretap must cease. The order in the present case not only lacks this important limitation, but specifically directs that the interceptions continue. We agree with what one commentator said of electronic surveillance: "No other form of official surveillance is as drastic an intrusion upon our thoughts, or lives." Fishman, *The "Minimization" Requirement in Electronic Surveillance: Title III, The Fourth Amendment and the Dread "Scott" Decision,* 28 Am U L Rev 315, 315-316 (1979).

In requiring more protection for our citizens in this area than the federal courts do, we are not alone. Recently, the Rhode Island Supreme Court reaffirmed its insistance on a standard of strict compliance with the requirements of its wiretap statutes, suppressing evidence because the order did not contain a particular description enumerating the types of communications sought to be intercepted. *State v. Sitko,* ___ RI ___, 460 A2d 1 (1983). The same court in an earlier case suppressed evidence because the wiretap order did not contain a provision requiring execution as soon as possible, a minimization requirement, and a termination clause. *State v. Luther,* 116 RI 28, 351 A2d 594 (1976).

In 1972, the highest court in Maryland determined that a wiretap order that lacked these same three provisions was invalid and required suppression of the evidence. The court announced that it would employ a standard of strict compliance in its examination of a wiretap application and order. *State v. Siegal,* 226 Md 256, 292 A2d 86 (1972). This standard of strict compliance with the preconditions for a

wiretap was recently reaffirmed in *State v. Bailey,* 284 Md 143, 422 A2d 1021 (1980).

Because we agree with defendant's contention that the order authorizing this wiretap did not conform to the statutory requirements, these conversations were intercepted unlawfully, and the conversations and all evidence derived therefrom must be suppressed. ORS 133.735.[5] We think strict adherence to the statute is the correct standard to govern district attorneys in drafting affidavits and orders and judges in scrutinizing such orders before authorizing a wiretap. We may leave to another day the question of whether a minor shortcoming in drafting would require the remedy of suppression when the order omits no essential element and the shortcoming in the order had no consequence in the actual execution of the order.

We affirm the Court of Appeals.

Roberts, J., concurred and filed an opinion.

Peterson, C. J., dissented and filed an opinion.

Jones, J., dissented and filed an opinion in which Carson, J., joins.

**ROBERTS, J.,** concurring.

I concur in the majority opinion and write to address some of the concerns expressed in the dissent.

The dissent acknowledges the defects in this order, yet concludes that the omissions are minor and, even if corrected, would further no privacy interests. The statute sets requirements for the contents of an order for interception. These requirements are comprehensive, explicit, and, in my opinion, well considered, and cannot be handily dismissed as "incantations."

The statute requires each order to specify the identity of the person whose communications are to be intercepted, the location of the phone, and a "particular description of the type of communication sought to be intercepted and a statement of

---

[5] We do not reach the question of whether ORS 41.910 would also require the suppression of this evidence.

the particular crime to which it relates." ORS 133.724(4)(a)-(c). It is with this provision that the state sought to comply in paragraph 3 of its order. The minimization language is a separate requirement found in ORS 133.724(5); it is a directive to the authorities who execute the wiretap that the privacy rights of telephone users must be protected throughout the intercept.

There are two statutory provisions concerning termination of a wiretap. One requires a statement whether the interception shall terminate automatically when the described communication is first obtained. The other compels termination "upon the attainment of the authorized objective." ORS 133.724(5). The purpose of the first is to compel the state to disclose whether it seeks to intercept one conversation or multiple conversations. The intent of the second is to cut off the wiretap at the earliest possible time.

This order states that the intercept would not automatically terminate when the described communications are received and omits any standard for termination except the 15 day expiration. Not only does the order fail to indicate whether the wiretap could continue even after interception of the first pertinent conversation, the drafters' inattention to statutory requirements resulted in an order which reads as though there were *no* limits on the wiretap except in number of days. Indeed, it was in this spirit that the wiretap was carried out. Even after they had gained sufficient evidence to arrest Tucker and Pottle the police continued the intercept; the officers came to Tucker's house, informed her of Pottle's impending arrest and then recorded her attempted call to Pottle in response. This last, an officer testified, was just "frosting on the cake."

With regard to a mandate that the intercept be "executed as soon as practicable," the order is deficient and the state has so conceded. As to Pottle's participation, the district attorney testified that the investigation centered on Pottle and Tucker, that Pottle was a primary suspect, and that at the time the application was presented there was probable cause to believe he was involved in the crime. Pottle should have been named in the order.

I do not see this case as a reversal on legal technicalities. This order is flawed in a number of important

respects. I agree with the majority that the deficiencies in this wiretap order render it fatally defective and evidence obtained pursuant to its authority must be suppressed.

**PETERSON, C. J.,** dissenting.

I join in the dissenting opinion of Jones, J., except for the section entitled "Minimization Execution," and wish to add these additional comments.

The police made a strong effort to comply with the wiretap law. The affidavits are in painstaking detail. A circuit judge reviewed the facts and authorized the wiretap.

At most, the order is deficient in two insubstantial respects. It does not state that the order "be executed as soon as practicable," and it does not state that the wiretap "must terminate upon attainment of the authorized objective," ORS 133.724(5).

Contrary to the majority's conclusion, I believe there was a minimization clause. The order stated that "the communications to be intercepted are limited to telephone conversations of Mindi Tucker * * * which pertain to the murder of Christopher Tucker and the intended distribution of $75,000.00 insurance proceeds she expects to collect." If this isn't a minimization clause I shall never be able to recognize one. *Cf. United States v. Kahn,* 415 US 143, 154, 94 S Ct 977, 39 L Ed 2d 225 (1974).

The wiretap law does not state that a violation of the statute requires the suppression of all evidence. *See* ORS 133.735. The majority's decision to suppress is not based upon a finding that the defendant's constitutional rights were violated. Rather, it finds insubstantial failures to comply with the statute and suppresses relevant evidence, evidence which was obtained pursuant to an order of a circuit judge upon review of facts and documents which revealed painstaking efforts of the police to follow the law.

**JONES, J.,** dissenting.

In this case, we deal with the statute set forth in the majority opinion. If the district attorney had drafted the order with the precise words of the statute, this case would not be before us. The case was lost by the state because the majority

says the wiretap order was legally facially defective in four particulars:

(1)   It failed to include a minimization clause;

(2)   It failed to include a termination clause;

(3)   It failed to include an immediate execution clause; and

(4)   It failed to specify the defendant as a person whose communications were to be intercepted.

To cure these defects, the district attorney would only have had to amend the order of the court as follows:

"Therefore, it is ORDERED that:

"1.   The interception of telephonic communications of Mindi Tucker **and Craig Pottle** are approved and authorized by this order;

"2.   That the telephonic instrument, [location and name of Mindi Tucker's roommate] is the description and location of the facility from which the wire communication is to be intercepted pursuant to this order;

"3.   That the communications to be intercepted are limited to telephone communications of Mindi Tucker **and Craig Pottle** which are made or received on the above described telephone which pertain to the murder of Christopher Tucker and the intended distribution of $75,000.00 insurance proceeds she expects to collect;

"4.   That this interception order shall be carried out by the Washington County Sheriff's Office; the person authorizing the application is Lt. John Vallery of the Washington County Sheriff's Office;

"5.   This order will remain in effect for a period of 15 days from the date hereof and will not automatically terminate when the above described communications are **first obtained** *[received];* it will terminate automatically upon the expiration of the above period unless extended pursuant to ORS 133.724 (5) and applicable provisions of said statute;

"6.   * * * * *

"7.   The application, this order, all supporting documents and testimony in connection herewith shall remain confidential in the custody of the court and these

matters shall not be released or information concerning them in any manner disclosed except upon written Order of this Court and as required under ORS 135.805 to 135.873; no person having custody of any records maintained under this Order pursuant to ORS 133.721 to 133.739 shall disclose or release any materials or information contained therein except under written Order of the Court as required under ORS ORS 135.805 to 135.873.

"**8. The authorization to intercept shall be executed as soon as practicable, and shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception, and must terminate upon attainment of the authorized objective, or in any event in 30 days.**"

The tensions generated by the competing goals of crime control and the protection of the right to privacy are most pronounced in the wiretap context and this is the first time this court has considered the interpretation of our wiretap statutes which were amended in 1979. These statutes were adopted to bring Oregon's wiretap provisions in line[1] with the federal standards in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 USC §§ 2510-20 (1976).

In *Scott v. United States,* 436 US 128, 130, 98 S Ct 1717, 56 L Ed 2d 168 (1978), the Supreme Court of the United States commented:

"* * * In this Act Congress, after this Court's decisions in *Berger v. New York,* 388 U.S. 41 (1967), and *Katz v. United States,* 389 U.S. 347 (1967), set out to provide law enforcement officials with some of the tools thought necessary to combat crime without unnecessarily infringing upon the right

---

[1]The legislative history accompanying the state act relating to interception of communications, Or Laws 1979, ch 716, makes clear that the purpose of Senate Bill 484 (that became ch 716) was to conform Oregon law to federal law. *See* Minutes, Senate Committee on the Judiciary, Tape 60, Side 1 (June 25, 26, 1979). The legal counsel to the Judiciary Committee, Ms. Godwin, stated before the House committee that the Oregon wiretap statute preceding ORS 133.724 was repealed because it was not in compliance with federal law. Law enforcement officers had to use the federal statute standards because the federal statute was *stricter* than the Oregon law at that time. Senate Bill 484, according to Ms. Godwin, codifies the federal law. Minutes, House Committee on the Judiciary, Tape 103, Side 1, 1:30 p.m. session (June 30, 1979).

of individual privacy. See generally S. Rep. No. 1097, 90th Cong., 2d Sess. (1968)."

I believe the Oregon legislature sought the same goals in adopting this state's wiretap statutes.

## THE MINIMIZATION ISSUE

In attacking the face of the order, the defendant contends that the order signed by the trial court was defective because it failed to include a minimization clause as provided in ORS 133.724(5):

> "* * * Every order and extension thereof shall contain a provision that the authorization to intercept * * * shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception * * *."

The statute does not specify how minimization should be ordered. Neither Title III of the federal act nor ORS 133.724(5) makes further mention of the minimization requirement, thereby leaving to the courts the task of supplying content to the term. The legislative history as recorded by the Oregon Senate Committee on the Judiciary merely tracks the language of 18 USC § 2518(5), adding that the provision was intended to recognize that each case must rest upon its own facts. S Rep No 1097, 90th Cong, 2d Sess, 103 (1968). The kinds of facts upon which the determination must rest, however, remain a legislative secret. Note, *Minimization of Wire Interception: Presearch Guidelines and Postsearch Remedies,* 26 Stan L Rev 1411 (1974). Because we are interpreting an Oregon statute, albeit with identical terms as the predecessor federal statute, we can write from a clean slate. The federal cases interpreting the minimization clause may be instructive, but they certainly are not binding on this court.

Contrary to the defendant's contention and the majority opinion, the order in this case did contain a minimization clause. Section 3 of the order states:

> "That the communications to be intercepted *are limited to* telephone communications of Mindi Tucker which are made or received on the above-described telephone which pertain to the murder of Christopher Tucker and the intended distribution of $75,000 insurance proceeds she expects to collect." (Emphasis added.)

The plain meaning of "are limited to" makes clear that other interceptions are forbidden by the order. If the wiretap in this case remained within the confines stated in section 3 of the order, minimization would have been achieved because the only intercepted calls would have been communications of Mindi Tucker relating to the murder of Christopher Tucker or the distribution of the insurance money. Similar to its federal counterpart, ORS 133.724(5) does not require that the order explain how minimization is to be achieved; it requires only that the order assert that there shall be minimization.[2]

Federal courts considering this issue have reached the same result. *See, e.g., United States v. Kahn,* 415 US 143, 94 S Ct 977, 39 L Ed 2d 225 (1974); *United States v. Vento,* 533 F2d 838, 860-62 (3rd Cir 1976); *United States v. Cirillo,* 499 F2d 872, 879 (2nd Cir), *cert den* 419 US 1056 (1974); *United States v. Rizzo,* 492 F2d 443, 446 (2nd Cir), *cert den* 417 US 944 (1974); *United States v. Manfredi,* 488 F2d 588, 598 (2nd Cir 1973), *cert den* 417 US 936 (1974); *Losinno v. Henderson,* 420 F Supp 380, 384-85 (DC SD NY 1976).

## TERMINATION

ORS 133.724(4)(e) provides:

"Each order authorizing or approving the interception of any wire or oral communication shall specify:

"* * * * *

"(e)   The period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been *first obtained* * * *." (Emphasis added.)

The order totally complies with this statute. The order responds to the statute by stating that the period of intercept will *not* automatically terminate when the described communications are received. The order contained the term "received" instead of "first obtained," but these words in

---

[2]
    "Section 2518(5) and its state counterparts [herein ORS 133.724(5)] contain no requirement that the minimization directive be more than a general instruction to minimize the interception of nonpertinent calls. * * *" Carr, Law of Electronic Surveillance § 4.07[5][b], 207 (1977).

context mean the same thing. There are obvious, valid reasons to continue the interception after the first admission of guilt is heard. Any experienced police officer or prosecutor knows that corroborating statements to back-up an initial admission can be vital. The majority completely misses the point on this assignment of error, by confusing ORS 133.724(4)(e) with ORS 133.724(5) which provides that the intercept "must terminate upon attainment of the authorized objective, or in any event in 30 days." Can we overturn this murder conviction because the order did not contain the supposed magical legal words "must terminate upon attainment of the authorized objective"? Granted, all concerned with upholding the law would heave a legal sigh of relief if the prosecutor or the trial judge had inserted that statutory incantation. But what does that phrase protect? What is its purpose? The order already provided for a limited listening period of only 15 days unless extended following procedures dictated by statute. The facts in this case reveal what happens in real life rather than in legal fiction. The moment the police felt they had intercepted enough information to attain their authorized objective, they voluntarily terminated the wiretap and arrested the defendants. They were already restricted by order to intercept only pertinent calls concerning the murder. If that objective was obtained within the 15-day period authorized by the court, is it realistic, even if one suffers from an acute Orwellian complex[3] that "big brother," in this case the Washington County Sheriff's Department, would provide around-the-clock personnel and equipment to intercept and to record calls for no conceivable purpose. Keep in mind, there is already a restriction in the order to record only pertinent calls. If nonpertinent calls are intercepted, that action violates the provision in ORS 133.724(5) which provides that the intercept "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." The order in this case prohibited non-pertinent calls of Mindi Tucker as previously discussed in this dissent. The

---

[3] "Congress considered and rejected the proposition that electronic surveillance would necessarily lead to 'excessive invasions of privacy and a Big Brother Society,' S. Rep. No. 1097, 90th Cong., 2d Sess. 66, *reprinted in* 1968 U.S. Code Cong. & Ad. News 2112, 2238. * * *" Goldsmith, The Supreme Court and Title III: Rewriting the Law of Electronic Surveillance 3 (1983), referring to George Orwell, Nineteen Eighty-Four 4 (1949).

order clearly limited the intercept to telephone communications of Mindi Tucker that were made or received on the described telephone which pertained to the murder of Christopher Tucker and the intended distribution of $75,000 insurance proceeds she expected to collect. So what is left? If the time of intercept is restricted to 15 days with authorized extensions, if the calls must still be pertinent, how could the police intercept unauthorized communications after attainment of the authorized objective? The answer is, they cannot. Any other answer defies logic and experience. I challenge the majority to point out one example where communication can be intercepted within 15 days after the attainment, and I assume this means *full attainment,* of the authorized objective, and still be pertinent. If the call is still pertinent, the full objective obviously has not been obtained. These are complementary terms. To say that the failure to provide such superfluous words in an order is fatally defective exalts form over the purpose of the statute. The purpose of the statute is to protect privacy. What privacy right has been violated by the scrivener's error in leaving out this redundant expression? I submit there is none.

## EXECUTION AS SOON AS PRACTICABLE

The statute, ORS 133.724(5), also contains a requirement that the order contain a provision that "the authorization to intercept shall be executed as soon as practicable." The purpose of the "immediate execution" provision is to prevent probable cause and other information upon which the order is based from becoming stale or inaccurate. S Rep No 1097 at 2192, *supra.* Implicit in section 5 of the order, which states in part that "[t]his order will remain in effect for a period of 15 days from the date hereof," is the necessity of quick execution of a wiretap of short duration. The effective date is the date of the order; the order's short duration, one-half of the permissible statutory maximum, tacitly requires that the order be executed promptly. The time had already begun running against the investigators. The necessity implicit within the constraints of the order is an appropriate assurance of immediate execution consistent with the goal that the law seeks to achieve.

On the federal level, the omission of the directive has been viewed as immaterial if the officers complied with its

demands. *United States v. Baynes,* 400 F Supp 285, 305 n 35 (DC ED Pa), *aff'd mem* 517 F2d 1399 (3rd Cir 1975).

The order substantially complies with the requirements of ORS 133.724(5) in that the short duration of the initial order was tantamount to requiring immediate execution, the 15-day limit with subsequent appearance before the authorizing judge assured as best as possible without judicial supervision that the order would terminate upon attainment of the authorized objective, and the order's limit on which communications were to be intercepted was sufficient to assert the required minimization.

In *United States v. Vento,* 533 F2d 838 (3rd Cir 1976), the order contained no provision that the order "be executed as soon as practicable." That court treated the omission as a "minor facial invalidity" and upheld the interception. *Id.* at 860-62.

In the case at bar, the intercept order was executed on December 17, 1980. The intercept was commenced December 18, 1980. Again, I challenge the majority to demonstrate how this defendant's right to privacy has been invaded by this minor legal omission of precise statutory words.

## FAILURE TO NAME POTTLE IN ORDER

ORS 133.724(4)(a) requires that the order specify "[t]he identity of the person, if known, whose communications are to be intercepted."

Defendant claims that ORS 133.724(4)(a) requires that he be named in the order because the application for the order alleged he was part of a conspiracy for which the wiretap was sought. The findings in the initial order authorizing the wiretap read as follows:

"This matter came before the Court on the application under oath of Ray Robinett, the duly elected District Attorney of Washington County, Oregon, for an Order authorizing and approving the interception of telephonic communications of Mindi Tucker and Craig Pottle. The sworn application was supported by affidavits.

"That this Court FINDS from the application and supporting affidavits and statements that:

"1.  There is probable cause for belief that Mindi Tucker committed, aided and abetted the commission or conspired to commit the murder of Christopher Tucker on December 15, 1980;

"2.  That there is probable cause for belief that communications between Mindi Tucker and Craig Pottle concerning the murder of Christopher Tucker will be obtained through an interception of telephonic communications of Mindi Tucker;

"3.  That normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried;

"4.  There is probable cause to believe that the telephone of [Mindi Tucker's roommate] is one commonly used by Mindi Tucker."

Although paragraph 2 of the findings refers to Pottle, it appears quite clear from paragraph 1 that the prime suspect was Mindi Tucker. The affidavits raised the desirability of intercepting phone calls between Mindi Tucker and Craig Pottle. The trial court found from the application and supporting affidavits, only that "1. There is probable cause for belief that Mindi Tucker committed, aided and abetted the commission or conspired to commit the murder of Christopher Tucker on December 15, 1980." The investigators may have had suspicions about Craig Pottle's involvement. The district attorney's application stated that Pottle "is either an accomplice to the murder or [he] would be a hostile witness * * *." However, no assertion was made that there was probable cause that Pottle was engaged in the criminal activity under investigation and therefore must be named in the order. As Mindi Tucker's boyfriend, his conversations possibly would be helpful and relevant whether or not he actually participated in the crimes.

The proposition that Pottle must be named in the order because there was a likelihood that he would be overheard was expressly rejected in *United States v. Donovan,* 429 US 413, 427 n 15, 97 S Ct 658, 50 L Ed 2d 652 (1977). *Donovan* made it clear that "a wiretap application must name an individual if the Government has probable cause to believe that the individual is engaged in the criminal activity under

investigation and expects to intercept the individual's conversations over the target telephone." *Id.* at 428. There is no requirement to name other potential witnesses or defendants. *United States v. Kahn,* 415 US 143, 94 S Ct 977, 39 L Ed 2d 225 (1974). The application for the wiretap order named Pottle and fully informed the judge of his relevance to the investigation; it met the requirements and purpose as explained in *Donovan,* 429 US at 426-27.

Even if the application showed probable cause as to Pottle's participation in the murder of Christopher Tucker and required that he be named in the order, *Donovan* concludes that a failure to include a person targeted for interception does not render the authorization order facially insufficient:

> "* * * If, after evaluating the statutorily enumerated factors in light of the information contained in the application, the judge concludes that the wiretap order should issue, the failure to identify additional persons who are likely to be overheard engaging in incriminating conversations could hardly invalidate an otherwise lawful judicial authorization. * * * [A]nd the failure to name additional targets in no way detracts from the sufficiency of those factors." *Id.* at 435.

The sufficiency of statutorily enumerated factors are not seriously challenged in this case. The investigation centered on Mindi Tucker. The district attorney's affidavit states:

> "(c) I have reasonable grounds to believe that one Mindi Marie Tucker committed, conspired to commit or aided and abetted in the commission of the crime of murder in the killing of her husband, Christopher Tucker."

Although Pottle's complicity was suspected, Mindi Tucker was the one upon whom the investigation was centered. The telephone was in her residence.

Even if Pottle's complicity were known, the order does refer to Pottle in paragraph 2 of the findings quoted above at page 11. Adding Pottle's name to the order would not have altered the scope of the permissible interceptions. On the basis of the affidavits, the court found that there was probable cause to believe that "Mindi Tucker committed, aided and abetted," and that it was not unreasonable for the court to list

only her name under the requirement of ORS 137.724(4)(a). Under *Donovan,* the order would be deemed facially valid; we should reach the same conclusion under the Oregon statute.

One final word on this subject, what is the purpose of naming persons in the order? Is not the real purpose of specifically naming "probable cause" suspects to give that person a civil cause of action under the statute if that person's rights have been violated? Or, is it merely to alert the judge signing the order who is involved to avoid any conflict of interest? Perhaps it is to aid the police in identifying callers, but presumably they already know the prime suspects. Once again, I challenge the majority to explain some rational reason for the provision and why the provision is so important in protecting one's right to privacy.

I submit the order was not defective in failing to name Craig Pottle, nor was it facially invalid in light of any of the above challenges.

## MINIMIZATION EXECUTION

Because the majority found the order of interception to be facially invalid, that opinion did not address the merits of the intercept. I choose to do so, to demonstrate the error made by the majority in reversing this case on legal technicalities which have no relevance to the privacy rights of this defendant.

In the murder case against Mindi Tucker, the trial judge found that there was no attempt made to minimize the 958 wiretap interceptions and that a substantial portion of the intercepted communications was beyond the scope of the order. Of the 958 calls on that phone over a 30-day period, 461 involved calls to or from Tucker, and the balance did not involve Tucker or Pottle nor any aspect of the crime. The trial court suppressed all of the intercepted conversations in her case. The state appealed this ruling, which was affirmed by the Court of Appeals. *State v. Tucker,* 62 Or App 512, 622 P2d 345 (1983). We denied the state's petition for review. Although a denial of a petition for review is not a decision of affirmance, it is obvious that the trial court and the Court of Appeals were correct in suppressing the evidence in the *Tucker* case for violation of the court's order which required minimization.

Since the appeal, the case of *State v. Mindi Tucker* has been dismissed by the prosecution.

Commentators recite that there are four separate procedures to minimize the interception of communications: Extrinsic, intrinsic, dual recorder and after-the-fact. *See, e.g.,* Fishman, *The 'Minimization' Requirement in Electronic Surveillance: Title III, The Fourth Amendment, and the Dread Scott Decision,* 28 Am U L Rev 315, 326 (1979).

*Extrinsic minimization* limits the time period during which monitoring is conducted. Here, the court limited the time to 15 days, with two extensions. The wiretap started December 17, 1980, and terminated with the defendant's arrest on January 15, 1981.

*Intrinsic minimization* attempts to screen out non-pertinent conversations while they are taking place. There are two variations: The first requires monitoring officers to make a reasonable effort to avoid both listening to and recording non-pertinent conversations.[4] *See, United States v. Turner,* 528 F2d 143, 156 (9th Cir 1975). The second variation involves listening to every conversation, but recording only pertinent conversations. Obviously, both variations have serious defects.

As to the first variation, when a wiretap is being executed, the listener often does not know whether a conversation contains the evidence he is seeking until after he has heard it in its entirety. Unless a monitor has a magic crystal ball, how is he or she to guard against the fact that a conversation which appears innocent at first may later turn to a discussion of criminal activity. *United States v. Armocida,* 515 F2d 49, 53 (3rd Cir 1975). Further, to require minimization of every conversation that is not obviously and immediately relevant would be an open invitation to criminals to

---

[4] "* * * For example, a monitor should either not listen to, or only spot check, a conversation between spouses concerning intimate family matters [not done in Pottle]; [but] he should, however, listen to and record in full a conversation between identified participants in the criminal scheme under investigation [done in Pottle]. * * *" Fishman, *The 'Minimization' Requirement in Electronic Surveillance: Title III, The Fourth Amendment, and the Dread Scott Decision,* 28 Am U L Rev 315, 324-25 (1979).

escape detection by the simple means of devoting the initial part of each call to non-criminal matters.

The second variation may violate the federal law. In *United States v. Clerkley,* 556 F2d 709, 718 (4th Cir 1977), the monitors listened to all conversations, but recorded only pertinent portions of the calls. That federal court expressed concern that such a procedure might violate § 2518(8)(a) (1976), which requires that the contents of intercepted communications "shall, if possible, be recorded on tape * * * in such a way as will protect the recording from editing or other alterations." One can imagine the dilemma of a federal prosecutor reading *Clerkley,* after considering *United States v. Daly,* 535 F2d 434 (8th Cir 1976), which suggests that not only is the recording of spot checks not required, but also that complete recording might violate the minimization provision. The prosecutor in the case at bar admitted he had not read any federal cases on wiretapping before ordering full recording. However, if he had, perhaps he still would not have known what to do.

The third procedure suggested for minimization is *dual recorder minimization.* Dual recorder minimization utilizes two tape recorders. Monitors follow intrinsic minimization by listening and recording on one tape recorder only when they think a conversation is, or is about to become, pertinent. A second recorder, the speaker of which is disconnected, records every conversation in full. This second tape is never played back. Thus, the monitors hear only what they are recording on the first recorder.

The fourth procedure is *after-the-fact minimization:*

"After-the-fact minimization involves recording every conversation and then restricting disclosure of nonpertinent conversations by transcribing only pertinent conversations, or by re-recording only pertinent conversations and then sealing the original tapes." Fishman, *supra,* 28 Am U L Rev at 329.

*See, United States v. Bynum,* 475 F2d 832, 837, *aff'd* 485 F2d 490 (2nd Cir 1973), *vacated on other grounds* 417 US 903 (1974), *aff'd* 513 F2d 533 (2nd Cir), *cert den* 423 US 952 (1975); *State v. Dye,* 60 NJ 518, 528-29, 291 A2d 825, 830, *cert den* 409 US 1090 (1972).

Although a dissenting opinion cannot be decisive, it may be informative. In this light, I believe the dual recorder minimization technique is the best approach for law enforcement officers to utilize in attempting to resolve this most vexing criminal procedure problem. Of course, as mentioned, each case will require separate evaluation.

The companion case of *State v. Tucker,* 62 Or App 512, 622 P2d 345 (1983), was not blessed with any segregation of pertinent versus non-pertinent interceptions, and the failure to minimize resulted in suppression. However, in this case against Pottle, we have an entirely different situation. Pottle and Tucker engaged in only 15 calls over the 30-day period authorized by the court. *All* of the communications were relevant to the specified crimes. None of them could have been further minimized using any of the four approaches listed above. Any officer who would have attempted to reduce those calls to spot checks would have been foolish indeed.

Professor James G. Carr has stated in his massive compendium on The Law of Electronic Surveillance 262 (1983):

> "Where interception occurs over the telephone or at the premises of one person without the eavesdropper's compliance with the minimization requirement, other persons whose conversations are overheard over that phone or at those premises may not have standing to suppress their intercepted conversations on the basis that the officers disregarded the minimization requirement. But where the conversations involve the criminal endeavor under investigation, they are properly overheard, and thus no minimization violation occurs as to them. Any general minimization violation affects the subscriber to the telephone service, possessor of the premises, or other target of the surveillance. It has been suggested, however, that all persons who are overheard have standing to participate in a hearing to review the officers' procedures and practices. If minimization did not occur, the suppression remedy will still be limited to those persons affected directly by such failure, *i.e.,* residents of the premises, primary users of the telephones, and targets of the surveillance." (Footnotes omitted.)

*See, United States v. Scott,* 164 US App DC 125, 128, 504 F2d 194, 197 n 5 (1974); *United States v. Ramsey,* 503 F2d 524, 532

(7th Cir 1974), *cert den* 420 US 932 (1975); *United States v. Poeta,* 455 F2d 117, 122 (2nd Cir), *cert den* 406 US 948 (1972).

There is no doubt that Pottle had standing to participate at the hearing to review the officers' procedures and practices, but he has no complaint that his right to privacy was invaded. *See, e.g., United States v. Alderman,* 394 US 165, 89 S Ct 961, 77 L Ed 2d 176 (1969); *United States v. Giordano,* 394 US 310, 89 S Ct 1164, 22 L Ed 2d 296 (1969).

Surely the subscriber of the phone, Tucker's roommate, had her privacy invaded. She made many personal nonpertinent calls over that phone during that 30-day period. But she has a very effective civil remedy for that invasion. ORS 133.739 provides in pertinent part:

"(1)   Any person whose wire or oral communication was intercepted, disclosed or used in violation of ORS 133.724 or 133.737 shall have a civil cause of action against any person who wilfully intercepts, discloses or uses, or procures any other person to intercept, disclose or use such communication and shall be entitled to recover from any such person:

"(a)   Actual damages but not less than damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is greater; [and]

"(b)   Punitive damages; * * *."

For example, in *Jacobson v. United States,* 592 F2d 515 (9th Cir 1978), the state court order to tap the Kings Castle Hotel and Casino in Nevada was held to be illegal. A call from Jacobson was intercepted and he brought a class action against the telephone company, the police, the district attorney, the sheriff, etc. First, the court held that the telephone company was liable though none of its employes listened, 18 USC § 2510(4); and, second, $1,000 in statutory damages were awarded against each defendant, totalling $12,000, as well as $12,000 in attorney fees, 18 USC § 2520.

As to Tucker, her hundreds of non-relevant, nonpertinent calls were not minimized and she received the legal remedy of complete suppression. However, Pottle, even though his conversations were intercepted, has no right to suppression of any of his conversations with Tucker. He was not the subscriber of the phone, nor did he live on the premises or regularly use the phone. He, in fact, never made a call *from*

the tapped phone. No call was privileged. He had nothing to do with the other calls and he could have cared less. There were no private non-pertinent messages in any of his calls. In every call he used gross street language, haranguing Tucker to hurry up and get the insurance money. There is no statutory language, nor any legal logic to throw a vicarious cloak of privacy over such a crime partner under the facts in this case.

In the controversial case[5] of *Scott v. United States,* 436 US 128, 98 S Ct 1717, 56 L Ed 2d 168 (1978), the Supreme Court ruled that in some circumstances monitoring officers can knowingly and wilfully ignore the minimization provision of Title III altogether. *Scott* involved successive wiretaps on the home telephone of Geneva Jenkins with whom Bernis Thurmon, a suspected participant in a narcotics importation and distribution network, was then living. Each warrant contained a minimization clause. Every one of the 384 calls occurring during 30 days of monitoring was overheard and recorded in full. The defendants moved to suppress the conversations and derivative evidence on the ground that the monitoring agents had failed to minimize the interception of non-pertinent conversations.

The Supreme Court considered two separate issues: (1) whether the government's failure to make any effort to minimize the interception of non-pertinent conversations automatically rendered the interceptions unreasonable under the Fourth Amendment and violative of the minimization provision of Title III; and (2) whether the total interception of each of the 384 calls, if not a per se violation, was "reasonable" under the particular circumstances in *Scott.*

Justices Rehnquist, Stewart, White, Blackman, Powell and Stevens rejected the defendant's contention that failure to make good faith efforts to comply with the minimization requirement was, in itself, violative of the Fourth Amendment or Title III. Adopting the government's viewpoint, the Court held that in ruling on suppression motions, courts should make an objective evaluation of monitoring agents' actions in light of the circumstances confronting them at the time to determine whether a statutory or constitutional

---

[5]It has been referred to by one commentator as the "Dread *Scott* Decision," Fishman, *supra* at n 4, 28 Am U L Rev at 330-31.

violation has occurred. The Court observed that subjective intent alone does not transform lawful conduct into an illegal or unconstitutional act. Subjective intent may be relevant to the deterrent purposes of the exclusionary rule in Fourth Amendment litigation only after a statutory or constitutional violation has been established. In *Scott,* the Supreme Court of the United States upheld the defendant's conviction.

Here, in the companion case of *State v. Tucker,* 62 Or App at 518-19, Judge Buttler, writing for the Court of Appeals, carefully distinguished *Scott.* We are not concerned in this case with the objective or subjective intent of the officers. The district attorney ordered the officers to intercept and record all the conversations, and the officers never saw the court's order. We are concerned with the issue raised, but not decided, in *Scott.*

"The Government * * * renews its argument that petitioner Scott does not have standing to raise a minimization challenge based upon the interception of conversations to which he was not a party. To permit such a challenge would allow Scott to secure the suppression of evidence against him by showing that the rights of other parties were violated. This, argues the Government, would contravene well-settled principles of Fourth Amendment law.

"Given our disposition of this case we find it unnecessary to reach the Government's contention regarding the scope of the suppression remedy in the event of a violation of the minimization requirement. We also decline to address the Government's argument with respect to standing. The Government concedes that petitioner Thurmon was party to some nonnarcotics-related calls and thus has standing to make the arguments advanced herein. Thus, even if we were to decide that Scott has no standing we would be compelled to undertake the decision of these issues. If, on the other hand, we were to decide that Scott does have standing, we would simply repeat exactly the same analysis made with respect to Thurmon's claim and find against Scott as well. In this circumstance we need not decide the questions of Scott's standing." *Scott v. United States,* 436 US at 136 (citations omitted).

I conclude that Pottle, as a person subject to electronic surveillance, had standing to challenge any intercepted conversations of his own with Tucker. Had some of those calls

been noncrime-related or privileged, he would have an arguable complaint about lack of minimization. However, since none of his conversations could have been minimized, he has suffered no invasion of his right to privacy.

Justice Roberts writes in her concurring opinion that the intent of the statute "is to cut off the wiretap at the earliest possible time." Where does this alleged intent come from? Who said it, where and when? The statute says the intercept must terminate "upon attainment of the authorized objective." It says nothing about terminating "at the earliest possible time."

The example of a supposed violation of the wiretap execution set forth in the concurring opinion is most unfortunate, for it may send a false message to those involved in electronic surveillance. The concurring opinion reads:

> "* * * Even after they had gained sufficient evidence to arrest Tucker and Pottle the police continued the intercept; the officers came to Tucker's house, informed her of Pottle's impending arrest and then recorded her attempted call to Pottle in response. * * *" 296 Or at 291.

Is this suppose to be an example of illegal execution? The majority opinion does not even address the execution issue. The majority solely attacks the face of the order. Let us assume we have a perfectly valid wiretap order with a clause that the intercept "must terminate upon attainment of the authorized objective." Is the concurring opinion suggesting that the intercept must terminate as soon as the first admission is made by one of the co-conspirators, when the first arrest occurs, when a prima facie case has been established or when proof beyond a reasonable doubt is obtained? The answer should be clear that the intercept can continue until the time limit expires or until the *full* objective has been obtained. Obviously, many highly incriminating statements can and do occur after the arrest of one of the conspirators. So long as the calls remain pertinent there is no legal reason to cut off the intercept. I cannot imagine this court reversing this conviction (if the order was valid on its face) because the police, in executing the order, continued to intercept an arrested co-conspirator's call to the murderer to tip him off that the police were closing in on him.

To sum up, first the order contained a clearly expressed minimization clause. Second, the order was limited to 15 days with legal extensions and the tap was in fact terminated upon attainment of the authorized objective. Third, the 15-day limitation in the order required immediate execution and execution commenced within 24 hours from the date of the order. Fourth, there was no need to name Pottle in the order. He was named in the application and the order was not directed to tap his phone or any phone he used.

What a pity that this conviction must be set aside with a 4-3 vote absent any violation of Craig Steven Pottle's privacy rights.

The Court of Appeals should be reversed and the trial court judgment affirmed.

Peterson, C.J., joins in this dissenting opinion as set out in his separate dissenting opinion; Carson, J., joins in this dissenting opinion.