Argued and submitted May 25, 1984, affirmed January 23, reconsideration denied March 8, petition for review denied April 16, 1985 (299 Or 37)

# STATE OF OREGON,
*Respondent,*

*v.*

# JANN RAYMOND OSLUND,
*Appellant.*

## (83-0123; CA A28771)

693 P2d 1354

Marilyn C. McManus, Deputy Public Defender, Salem, argued the cause for appellant. With her on the brief was Gary D. Babcock, Public Defender, Salem.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

**BUTTLER, P. J.**

Defendant appeals his conviction for aggravated murder, assigning three errors. First, he contends that the trial court erred in failing to suppress certain tape-recorded statements, because the application on which the order authorizing the interception was based failed to demonstrate the inadequacy of alternative investigative procedures, as required by ORS 133.724(1)(h) and 133.724(3)(c).[1] Second, he contends that his "confession" was insufficiently corroborated as required by ORS 136.425, and, third, that the 30-year minimum sentence imposed for aggravated murder violates Article I, section 15, of the Oregon Constitution. We affirm.

On the morning of December 28, 1982, Vernon Johnson was found dead in his home fully clothed and in bed, with a single gunshot wound in his right cheek. A pistol containing five bullets and one spent casing was found on the dresser. Defendant was interviewed by police officers on December 28, 1982, and January 4, 1983, regarding the homicide; he was not then a suspect. At that time, defendant told the police that he had spent the evening of December 27 with Johnson, left Johnson's home at approximately 9:30 p.m., went to a tavern and later had breakfast at a restaurant with some friends. When asked who he thought was responsible for the murder, he stated, "[I]f you ask me, I think that Richard Mounts killed him. Everybody knows Mounts hated Johnson."

On January 31, Logan Conley told the police that approximately five days after Johnson's body was found, defendant had come to Conley's residence and had told him that he had killed Johnson while he was asleep in bed. He told Conley that he had taken Johnson's gun from a dresser in the bedroom, walked around the foot of the bed and shot at Johnson's face and head. He then had placed the gun back on the dresser and stood in the bedroom for approximately 10 to

---

[1] Defendant moved to suppress the intercepted conversation under ORS 133.735(1)(a), which provides:

"(1) Any aggrieved person in any trial, hearing or proceeding in or before any court, department, officer, agency, regulatory body or other authority of the state, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted under ORS 133.724, or evidence derived therefrom, on the grounds that:

"(a) The communication was unlawfully intercepted."

15 minutes until he heard blood dripping on the floor. Defendant also told Conley that the incident had occurred at approximately 9:30 p.m. on December 27, 1982, and that he was paid $500 by Mounts to kill Johnson. Conley told police that he had had two additional conversations with defendant, during which defendant gave him the same information.

On February 2, 1983, Denise Phillips, who had dated defendant for three weeks in December, told police that, during that period, defendant had told her that there was a "contract" out on Johnson and that he was going to be killed. At defendant's request, Phillips had introduced him to a friend who was familiar with weapons, and the three discussed various ways to kill a person. The friend suggested placing a propane torch under the motor of the intended victim's car. Phillips stated that defendant bought a torch and had said several times that he was going to kill Johnson, but then would come back and say that he could not do it. On December 24, 1982, defendant told Phillips that by the time she returned from a trip to California, Johnson would be dead. On her return from that trip, Phillips asked defendant if he had murdered Johnson. He advised her that he did not want to place her in the position of knowing, but volunteered that, because he was late in doing it, he was paid only $136. He also told her that it was the first time he had taken a "contract" when he knew the person, and it was difficult.

■    Pursuant to ORS 133.724, on February 2, 1983, the district attorney filed an application for an *ex parte* order for the interception of an oral communication. That application stated that there was probable cause to believe that defendant had committed a murder, the details of which were set forth in attached affidavits, and that a conversation between Conley and defendant was expected to take place in a motor vehicle at an unknown place to be designated by defendant. It also stated, in pertinent part:

"(d)   That I seek to intercept the oral communications of Logan Conley and Jann Raymond Oslund which pertain to the gunshot death of Vernon Johnson and more particularly, how Jann Raymond Oslund planned, prepared and actually criminally caused the death of Vernon Johnson, and what efforts he wants Logan Conley to engage in to assist him from avoiding detection and apprehension by police authorities. .

"(e)   That the interception of the oral communications

described in Paragraph 3(d) is necessary and essential in order to gain evidence regarding commission of the crime of murder, and such evidence cannot otherwise be obtained by the use of normal investigative procedures because they reasonably appear to be unlikely to succeed and there are no other means readily available for obtaining such information. An attempt to get Jann Raymond Oslund to discuss with Logan Conley on the telephone - so that it could be recorded - the details of how he planned, prepared and actually killed Vernon Johnson and what precise efforts he wants Logan Conley to engage in to assist him from avoiding detection and apprehension by police authorities, has been tried and failed. Said failed effort is more particularly described in the attached affidavit of Jerry Finch. Further, at the present time, Oslund does not know that Logan Conley has provided the information outlined in the attached affidavits to police authorities and it is not feasible to contact him regarding same as he has previously been contacted as outlined in Reyna's attached affidavit, and has denied any involvement in Vernon Johnson's death."

The affidavits of police officers attached to the application related the details of police conversations with defendant, Conley and Phillips and further described the unsuccessful attempt to obtain information from defendant via a tape-recorded telephone conversation with Conley. One affiant stated that Conley had taken a polygraph test to determine whether the information he said he had obtained from defendant was truthful and that the examination indicated deception on Conley's part. On February 2, the court entered an order authorizing the interception, which took place the same day. During the intercepted conversation, defendant told Conley the details of his murder of Johnson.

The relevant statutes, ORS 133.724(1)(h) and (3)(c), provide:

"(1)   An ex parte order for the interception of wire or oral communications may be issued by any circuit court judge upon written application made upon oath or affirmation of the individual who is the district attorney for the county in which the order is sought. The application shall include:

"* * * * *

"(h)   A full and complete statement as to whether or not other investigative procedures have been tried and failed or

why they reasonably appear to be unlikely to succeed if tried or are likely to be too dangerous;

"* * * * *

"(3) Upon examination of such application and evidence the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire or oral communications within the state if the judge determines on the basis of the facts submitted by the applicant that:

"* * * * *

"(c) Normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or are likely to be too dangerous."

Defendant's contention is that the district attorney's application was insufficient to support the court's determination that "normal investigative procedures have been tried and failed," because the state had already obtained all of the details of the crime from Conley and Phillips and any further inquiry was unnecessary.

The Oregon wiretap statutes, ORS 133.721 *et seq,* were adopted to bring Oregon's provisions into line with federal standards in Title III of the 1968 Omnibus Crime Control Act, 18 USC §§ 2510-2520. *State v. Pottle,* 296 Or 274, 282, 677 P2d 1 (1984). Because 18 USC § 2518(1)(c) and (3)(c)[2] are identical to ORS 133.724(1)(h) and (3)(c), decisions construing the federal statutes are helpful in construing the state statutes. *U. of O. Co-Oper. v. Dept. of Rev.,* 273 Or 539, 544, 542 P2d 900 (1975).

Federal courts have emphasized that the purpose of the "other investigative techniques" requirement

"* * * is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Martino,* 664 F2d 860, 868 (2d Cir 1981), *cert den* 458 US 1110 (1982).

---

[2] 18 USC § 2518(1)(c) requires a wiretap applicant to include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Under 18 USC § 2518(3)(c), the issuing court must also find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

*See United States v. Fury,* 554 F2d 522, 529-30 (2d Cir), *cert den* 433 US 910 (1977), 436 US 931, 98 S Ct 2831, 56 L Ed 2d 776 (1978). Stated differently, the requirement is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn,* 415 US 143, 153 n 12, 94 S Ct 977, 39 L Ed 2d 225 (1974). The district attorney's application must provide a factual basis from which the issuing judge may conclude

> "* * * that normal investigative techniques have been employed in a good faith effort to determine the identity of those violating the law and to assemble sufficient evidence to justify their prosecution and that these efforts have failed to achieve their ends." *United States v. Spagnuolo,* 549 F2d 705, 710 (9th Cir 1977).[3]

Although *State v. Pottle, supra,* requires strict compliance with all statutory requirements before an order authorizing a wiretap is granted, we think the district attorney did that here. Federal courts review the prosecutor's required showing in a "practical and commonsense fashion." *See* S Rep No. 1097, 90th Cong, 2d Sess 101 (reprinted in 1968), US Code Cong & Admin News, 2112, 2190 (1968); *United United States v. Martino, supra,* 664 F2d at 868; *United States v. Armocida,* 515 F2d 29, 37 (3d Cir), *cert den* 423 US 858 (1975).

Viewing the application and supporting affidavits in that manner, we conclude that they provided sufficient factual information from which the court could find that normal investigative procedures had been tried and had failed or reasonably appeared to be unlikely to succeed if tried. It is true that the police had received highly incriminating information from both Phillips and Conley and that, if Conley were to be believed, they had what amounted to a complete confession by defendant. However, the reliability of Conley's information had been determined to be questionable by a polygraph test. Moreover, defendant's references to the murder during his conversations with Phillips were veiled, inconsistent and

---

[3] Other cases indicate that the demonstrated "need" for evidence is not limited to that which would be sufficient to arrest and indict a suspect; rather, it includes additional evidence sufficient to convict a suspect. *See United States v. Turner,* 528 F2d 143, 152 (9th Cir) *cert den* 423 US 996 (1975), 429 US 837 (1976); *United States v. Kerrigan,* 514 F2d 35, 38 (9th Cir), *cert den* 423 US 924 (1975).

confusing. Both witnesses were vulnerable to impeachment. Thus, the state could reasonably conclude that it had insufficient reliable evidence to convict defendant and that corroborating details were necessary. Because defendant was unaware of Conley's involvement with the police, it was reasonable to conclude that the most likely way to confirm Conley's credibility was through a face-to-face meeting between him and defendant, during which the conversation would be recorded and the details of the murder would be disclosed.

We conclude that the district attorney's explanation of his efforts to verify the hearsay information given by Conley and Phillips through more conventional techniques was adequate to comply with the requirement of ORS 133.724(1)(h) and to permit the court to make the requisite finding under ORS 133.724(3)(c).

■ In his second assignment, defendant contends that the trial court should have granted his motion for acquittal, because there was insufficient evidence to corroborate every element of the crime of aggravated murder. Specifically, he argues that there must be some evidence, independent of his admissions, that the murder was for hire, relying on ORS 136.425(1).[4]

In *State v. Lerch,* 296 Or 377, 394, 677 P2d 678 (1984), the court reaffirmed *State v. Henderson,* 182 Or 147, 184 P2d 392, 186 P2d 519 (1947), in which it held that that statute is satisfied when the state presents independent evidence of the corpus delicti. The court said:

"ORS 136.425(1) tracks with the common-law rule. The part of the statute under consideration can be paraphrased: 'without some evidence independent of the confession which tends to establish or to prove the corpus delicti.'

"The point we are making is that in spite of the loose language in some of our previous cases, it is not necessary that the corroborating 'proof' independent of the confession prove

---

[4] ORS 136.425(1) provides:

"A confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against him when it was made under the influence of fear produced by threats; nor is a confession only sufficient to warrant his conviction without some other proof that the crime has been committed."

or establish the corpus delicti. The statute only requires that the state introduce independent evidence that tends to establish the corpus delicti. In addition to its function of tending to establish the corpus delicti, the independent corroborating evidence may be used together with the confession to prove all elements of the crime including the corpus delicti beyond a reasonable doubt."

The court went on to hold that, in a homicide case, the corpus delicti consists of evidence that a death has occurred and that the death resulted from a criminal agency. Thus, in a homicide case, independent proof of other elements, such as intent, a contract to kill, recklessness and so forth, is not a part of the corpus delicti. In *Lerch,* the court concluded:

"* * * Suffice it to say that we find there is some proof independent of the defendant's confession that tends to prove the corpus delicti and that a jury could have found from the independent proof and the defendant's confession that the state sustained its burden of proof as to all elements of the crime beyond a reasonable doubt." 296 Or at 398.

Assuming that some independent proof[5] is necessary to establish that defendant killed Johnson for money, there is some evidence that tends to prove that he did kill for money. Defendant had no apparent legitimate source of income, yet he flaunted his possession of a large amount of money soon after the killing. It is enough if there is *some* proof, circumstantial or otherwise, from which a reasonable inference may be drawn that defendant had received the money for the murder of Johnson, about which he had been talking among his acquaintances. *See State v. Lerch, supra,* 296 Or at 398.

■ Lastly, defendant contends that his sentence for life with a 30-year minimum without possibility of parole and a five-year year minimum for use of a firearm violates Article I, section 15,[6] of the Oregon Constitution, because it does not allow for the possibility of reformation. He relies, as did the defendant in *Norris v. Cupp,* 67 Or App 393, 678 P2d 756, *rev den* 297 Or 824 (1984), on the statement of Tanzer, J., in his

---

[5] In *State v. Lerch, supra,* the court declined to decide whether the defendant's admission to others could be used to corroborate his confession.

[6] Article I, section 15, provides:

"Laws for the punishment of crime shall be founded on the principles of reformation, and not of vindictive justice."

concurring opinion in *State v. Shumway,* 291 Or 153, 171, 630 P2d 796 (1981).

> "In my opinion, the minimum penalty for murder, standing alone, is invalid because it offends Article I, Section 15, of the Oregon Constitution. I conclude that a severe, inflexible minimum penalty for every murder, regardless of circumstances, is unconstitutional * * *."

That view has not been adopted by the court; in any event, the statement addresses severe, inflexible minimum sentences for murder, regardless of the circumstances. Here, defendant stands convicted of aggravated murder, and by definition particular circumstances form an element of that offense. ORS 163.095. In *Norris v. Cupp, supra,* we upheld the 20-year minimum sentence then applicable to aggravated murder against the defendant's Article I, section 15, claim, noting that the constitution does not prohibit the legislature from providing heavier minimum sentences for crimes that may be considered more dangerous to the public. Murder for hire may be so considered; the factors of deterrence and public safety are not precluded by Article I, section 15. *State v. Lippert,* 53 Or App 358, 632 P2d 28, *rev den* 291 Or 893 (1981), disposes of defendant's constitutional claim relating to the five-year minimum for use of a firearm.

Affirmed.