Argued and submitted January 30, affirmed October 25, appellant's reconsideration allowed; respondent Stockfleth's reconsideration denied by opinion February 7, 1990
See 100 Or App 376, 786 P2d 227 (1990)

STATE OF OREGON,
*Appellant,*

*v.*

KATHLEEN R. STOCKFLETH,
*Respondent.*

(86-3-30485, 86-3-30486; CA A44567 (Control))

STATE OF OREGON,
*Appellant,*

*v.*

MICHAEL JOHN LASSEN,
*Respondent.*

(86-3-30488; CA A45133)
(Cases Consolidated)

781 P2d 1220

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Wayne Mackeson, Portland, argued the cause for respondent Kathleen R. Stockfleth. With him on the brief was Des Connall and Dan Lorenz, P.C., Portland.

No appearance for respondent Michael John Lassen.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

In these prosecutions for felony murder, arson, conspiracy to commit arson, attempted theft and conspiracy to commit theft, the state appeals from the trial court's suppression of the results of two consecutive *ex parte* wiretap orders. The court suppressed the results on the ground that the orders did not contain adequate termination provisions, as required by ORS 133.724(4)(e) and ORS 133.724(5). The only argument made by the state on appeal is that the termination provisions are adequate. Defendant Stockfleth, the only defendant who appears here, argues, as she did below, that, not only are the termination provisions inadequate but that, in addition, the orders and applications for the orders violated the statute and were deficient in several other particulars, any one of which justifies suppression.

Each wiretap order was issued on an application, in the form of an affidavit, filed by the district attorney and incorporating by reference an affidavit of Montgomery, an Oregon State Police detective.

The court issued the first order on January 31, 1986. We summarize the relevant allegations of the affidavits on which the first application was based.[1] Defendant Lassen was the contract vendee of Odie's Tavern and was behind in his contract payments to defendant Stockfleth, who was the vendor's assignee of that contract. Lassen also owed money to Hauck, from whom he had purchased a part interest in the tavern. Odie's partially burned in a fire in September, 1985. Lassen collected the insurance proceeds and then increased his insurance coverage. The new policy, which covered the building, contents and business, was scheduled to lapse on February 1, 1986. On January 24, 1986, Lassen and his employe, Thompson, disconnected the furnace from its gas line and removed some panels from the furnace. On January 26, at about 1:30 p.m., Lassen was in the building with Thompson and four friends, allegedly to pick up supplies for a wedding. Lassen had the only key to the tavern. That day, Lassen had intended to give Thompson the key to Odie's so

---

[1] The trial court granted motions to disregard certain allegations in the affidavits as hearsay, conclusory or inaccurate. The state does not assign that as error. We summarize the affidavits, excluding the portions disregarded by the trial court.

that she could let in workmen, who were to begin repairing damages from the earlier fire, the next day. For an unexplained reason, Lassen changed his mind and decided to keep the key.

At 6 p.m. on January 26, 1986, Schwebke smelled gas coming from Odie's. At 12:30 a.m. on January 27, 1986, an explosion occurred at Odie's, followed by a fire. Witty, who lived in a building next door, died in the fire. The investigation revealed that the explosion was consistent with a natural gas explosion and that the natural gas lines to the furnace and other appliances at Odie's had been opened manually before the fire. The gas company confirmed that there were no gas leaks in the lines leading to the heater on the exterior of the building. The building had been secure before the fire, with the front door padlocked and nailed shut and the back door secured by deadbolts. An investigator for the Oregon State Police determined that the cause of the fire was arson.

Montgomery interviewed Lassen and Thompson. Thompson stated that she had spoken by telephone with Lassen daily concerning the fire and that she and Lassen had discussed in detail their activities between January 24 and January 26 related to the fire. Lassen refused to take a polygraph test. He asked whether his telephone was being tapped. Montgomery advised him that it was not being tapped at that time.

ORS 133.724(4)(e) provides that an *ex parte* order approving a wiretap must specify "[t]he period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained." ORS 133.724(5) provides, in part, that "[e]very order and extension thereof shall contain a provision that the authorization to intercept * * * must terminate upon attainment of the authorized objective, or in any event in 30 days."

The first order provides, in part:

"2(b) The Communications sought to be intercepted are particularly described as Communications involving [Lassen] who was involved in the commission or possesses knowledge of the crime of Felony Murder and Arson in the First Degree committed at the premises known as Odie's tavern in Elgin, Oregon on or about January 27, 1986, and will relate to and be

evidence of the crimes specified in paragraph 2(a) above[.]
* * *

"(c) The interception particularly described in paragraph 2(b) above is necessary and essential in order to gain evidence of the commission by [Lassen] of the aforesaid crime, and there are no other means readily available for obtaining such information, and *there are reasonable grounds to believe that evidence will be obtained essential to the solution of such crimes,* and such evidence cannot otherwise be obtained by the use of normal investigative procedures[.] * * *

"* * * * *

"(e) The nature of the criminal activity described above is such that, after the particularly described communication has first been intercepted pursuant to this Ex Parte Order of Authorization, additional wire or oral communications of the same type may occur and, therefore, this order of authorization should not automatically terminate when the particularly described type of communication has been first obtained but should continue as specified in the paragraph 3(b) below[.]

"* * * * *

"3(b) The interception process shall commence without prior or simultaneous notice to any potentially aggrieved person and as soon as practical on the 31st day of January, 1986, and thereafter, shall terminate automatically as soon as the necessary evidence has been obtained and the objective of the interception has been attained but, in any event, no later than 30 days, and the interception process shall not automatically terminate when the particularly described type of communication has been first obtained but shall continue as otherwise specified herein[.]" (Emphasis supplied.)

■  A wiretap order must contain a statement of the authorized objective of the interception that is sufficiently definite to state the point when it has been attained and when the authority to intercept ends. *State v. Pottle,* 296 Or 274, 285, 677 P2d 1 (1984). The trial court held that the order's termination provision was inadequate, because it permitted the interception to continue beyond the attainment of the authorized objective. The court viewed the objective of the wiretap to be the interception of "certain communications" described in paragraph 2(b). The order permitted the interception to continue after the first of such communications was intercepted and did not state separately when, subsequent to that time, the interception would terminate, other than "when

the objective of the interception has been attained." The court reasoned, therefore, that the order contained no termination provision, because it implicitly permitted the interception to continue indefinitely until no more evidence could be obtained or until 30 days had passed.[2] We do not read the order so broadly.

■    We read the *objective* of the wiretap to be, first, as stated generally in paragraph 2(b), to intercept communications involving Lassen related to the crimes listed in paragraph 2(a) and then, as more precisely stated in paragraph 2(c), to obtain evidence "essential to the solution of [those] crimes," *i.e.,* to gain evidence sufficient to convict the perpetrators. *See State v. Pottle, supra,* 296 Or at 285. Pursuant to paragraph 3(b), once that evidence was obtained, the interception was to terminate, whether or not the wiretap might continue to reveal additional evidence concerning the crimes. We hold that, although the stated objective is, by necessity, somewhat broad, it is sufficiently definite to state the point at which it would have been attained and at which the authority to intercept would end. *State v. Pottle, supra.*[3] The trial court erred in determining that the termination provision was inadequate.[4]

The trial court rejected several other challenges to the wiretap evidence. Although defendant does not cross-appeal, we consider her argument that the trial court erred in rejecting those challenges and that the suppression should be affirmed for other reasons. *Artman v. Ray,* 263 Or 529, 533, 502 P2d 1376 (1972). We address only one of the contentions, because it is dispositive.

---

[2] The 30-day provision is a "duration" directive, not a termination directive. *State v. Pottle, supra,* 296 Or at 285.

[3] ORS 133.724(6) provides:

"Whenever an order authorizing interception is entered pursuant to this section, the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception."

Both orders entered by the trial court contained judicial reporting provisions, allowing the issuing magistrate to determine what progress has been made toward achievement of the authorized objective and to determine when termination is required.

[4] The second order, issued on February 19, 1986, contains an identical termination provision.

■ Defendant argues that the applications for the *ex parte* orders failed to comply with ORS 133.724(1)(h), which requires that the application contain "[a] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried * * *[.]" The point of that requirement is not that the state must exhaust every investigative technique before resorting to a wiretap, but simply to "assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *State v. Oslund,* 71 Or App 701, 707, 693 P2d 1354, *rev den* 299 Or 37 (1985). The application must provide a factual basis from which the issuing judge may conclude that normal investigative techniques have been tried in good faith to determine the identity of those violating the law and to justify their prosecution, and that those efforts have failed. *State v. Oslund, supra.*

■ Here, both the first and second applications state that "[o]ther investigative procedures have been pursued and have failed." They also state that Lassen has been interviewed and does not admit committing the arson; that Thompson has been interviewed and "has admitted discussing in detail with Lassen their activities between January 24th and 27th"; that other unnamed suspected participants have not been cooperative; and that "[i]t does not appear that attempts to obtain information from Lassen via a tape recorded telephone conversation between Lassen and one of the suspected participants would be possible as [Montgomery] does not believe that any of the suspects would participate in such a tape recorded conversation." The applications indicate that Lassen and Thompson, two of the six persons on the premises of Odie's on the day before the fire, had been interviewed and were not forthcoming with information helpful to solving the crimes and that Lassen would not participate in a polygraph test. There is no indication in the applications whether the other four people present at the tavern the day before the fire had been interviewed; the affidavits state only that "none of these people would have a motive or stand to gain from a fire at Odie's."

Whether or not the four people last at the tavern with Lassen several hours before the fire would have a motive or stand to gain from the fire is not the point. The question is

whether any of those persons, who had no apparent motive to lie, might have information that would be relevant to solving the crimes. In fact, it is apparent that the state thought that they might have relevant information, because the affidavits state that it intended to subpoena them to appear and testify before the grand jury. In our view, questioning those persons was central to the investigation. The failure to conduct those interviews indicates that normal investigative techniques had not been attempted before resorting to the interception of telephone communications. In fact, the applications demonstrate that certain traditional techniques were delayed so that they could be carried out *during* the wiretap, apparently in order to trigger incriminating telephone communications.[5] We conclude that the applications fail to set forth facts sufficient to establish the statutory requirement that normal available investigative techniques were tried in good faith and failed, and we affirm the trial court on that basis.

Affirmed.

---

[5] The district attorney's application for the first order states:

"More particularly search warrants are being applied for to search [Lassen's] residence * * * for evidence of business records pertaining to financial motive, and a search warrant is being sought for the residence of [Thompson,] * * * for the pipe wrench used in disconnecting the gas line fittings, and any other evidence of arson. The search warrants will be executed within the next three days. Also within three days Grand Jury subpoenas will be served on [Thompson], [and on the four other individuals present at Odie's with Lassen the day before the fire.] It is expected that the execution of the search warrants and the service of these subpoenas will trigger numerous phone calls to and from [Lassen] over an extended period of time up to ten days.

"* * * * *

"* * * It is anticipated that the search warrants referred to above will be executed * * * within the next three days. When the search warrant is served on [Lassen] he will be informed that a search warrant is going to be served on [Thompson]. He will also be informed that numerous witnesses are going to be contacted, and grand jury subpoenas will be served * * *. It is requested that the authorization for interception not automatically terminate after [Lassen] makes the first phone call concerning the fire. It is anticipated that he will contact other parties as well to discuss with them any statements that they might make to investigators. He will likely contact witnesses to discuss the destruction of evidence."